2021 IL App (2d) 200360
Nos. 2-20-0360 & 2-20-0717 cons.
Opinion filed December 28, 2021

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE VILLAGE OF ROSELLE, | ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 19-MR-1032 |
| | ) | |
| THE BOARD OF TRUSTEES OF THE ROSELLE FIREFIGHTERS' PENSION FUND and RYAN CASE, | ) ) ) | Honorable |
| | ) | Bonnie M. Wheaton, |
| Defendants-Appellants. | ) | Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court, with opinion.
Justices Zenoff and Hudson concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, the Board of Trustees of the Roselle Firefighters' Pension Fund (Board),

issued a decision finding that the defendant Ryan Case was entitled to receive a line-of-duty (duty)

disability pension following a back injury he sustained while moving bottled water for a fire

department event. The plaintiff, the Village of Roselle (Village), which had intervened in the Board

proceedings, filed an administrative review action. The circuit court reversed the Board's decision.

The Board and Case now appeal.[1]  We reverse the circuit court and affirm the Board's decision.

_____

        [1] After the circuit court issued its decision, the Board filed a notice of appeal (No. 2-20-

¶ 2                                    I. BACKGROUND

¶ 3      Case began working as a firefighter in December 2002. Over the next 13 years, he was employed at various times by the fire departments of Belvidere, Wauconda, Woodstock, and Cary. In June 2015, he was hired by the Village's fire department.

¶ 4      Case's documented back problems also began in 2002 and thus go back at least as far as his work as a firefighter. Medical records from 2006, 2008, 2009, and 2012 show doctor visits for low back pain. None of his complaints of pain was associated with any injury and all were treated solely with muscle relaxants. The 2009 visit included an X-ray; the doctor Case saw reported that Case's X-ray and physical examination showed a normal back, with "excellent strength" in his arms and legs. The 2012 visit (to Dr. Haider, Case's primary care provider) included a complaint of pain with neck movement, but again there was no associated injury and the only treatment was muscle relaxants.

¶ 5      In 2013, Case missed nine days of work due to a work-related muscle strain in his lower back. To treat the strain, he took muscle relaxants and rested. A June 2013 e-mail from a doctor to his then-employer stated that Case had strained his left lower back but had responded fairly quickly to rest, and he was able to work out "without any residual." In 2014, Case applied to work with

_____

0360), while Case filed a motion for reconsideration in the circuit court. Case then filed an appearance in appeal No. 2-20-0360 and successfully sought a stay of that appeal until proceedings in the circuit court had been completed. After the circuit court denied his motion for reconsideration, Case filed his own appeal (No. 2-20-0717), in which the Board also appeared. We consolidated the two appeals.

the Belvidere Fire Department. His application included a polygraph test, during which he said that he had had a 2013 work-related back injury.

¶ 6    Case was seen by Dr. Haider in April 2015 for tightness in his back and legs after a 90-minute train trip during which he had to sit in a cramped position. Dr. Haider prescribed muscle relaxants and recommended that he follow up with a specialist.

¶ 7    Case applied to work for the Village's fire department in 2015. At his May 13, 2015, preemployment physical examination, he gave certain responses that the Village asserts were false. Specifically, he stated that (1) he had never had a back injury and (2) he did not currently have any of the listed musculoskeletal problems, including back pain. At the Board hearing in this case, Case said that he answered truthfully because he was not having any back pain when the examination occurred.

¶ 8    In late May 2015, Case visited an emergency room for cramping in his legs and tightness in his back after a long bike ride. An MRI showed a mild central disk bulge at L5-S1 that did "not appear to cause significant encroachment on the thecal sac." No treatment other than muscle relaxants was prescribed, and the symptoms were gone by the next morning. On June 3, 2015, Case sought a physical therapy referral for lower back pain.

¶ 9    Case began working for the Village fire department on June 8, 2015. During his first month of work, Case was thrown onto an oxygen tank while assisting in the back of an ambulance. He sprained his shoulder, missing one day of work. His medical records from that day do not show any complaint of back pain. In August 2015, he visited Dr. Haider for back pain and was prescribed muscle relaxants. Case completed his one-year probationary period in June 2016.

¶ 10    On September 18, 2016, Case was on duty. The fire department was preparing for their annual open house, during which the fire station would be open to the public. The shift commander

ordered Case and another firefighter to perform various tasks in preparation, including moving cases of bottled water from one side of the station to the other and then filling a cooler with the bottles. While filling the cooler, Case felt a pop and pain, and began having a hard time moving his legs. Paramedics were called and Case was transported to a hospital emergency room. The MRI taken that day showed an acute right-side L5-S1 disk herniation compressing the S1 nerve root. Thereafter, Case began a course of treatment that included pain medications, physical therapy, cortisone shots, and eventual surgery to fuse his lumbar spine. He was permanently restricted to lifting less than 50 pounds and was unable to return to full duty as a firefighter/paramedic for the Village. He applied for a duty disability pension under section 4-110 of the Illinois Pension Code (Code) (40 ILCS 5/4-110 (West 2016)).

¶ 11   Case was examined by three independent medical examiners (IMEs), who were provided with all of his medical records. The IMEs unanimously concluded that Case was disabled as a result of his September 2016 injury.

¶ 12   The Village successfully requested leave to intervene in the proceedings on Case's application. The Village provided the IMEs with additional information and asked each of them to revisit their opinions in light of the Village's contention that Case had lied in failing to disclose his preexisting back condition. All of the IMEs issued supplemental letters stating that their opinions had not changed. They noted that, although Case had experienced back pain before that injury, his May 2015 MRI did not show the degeneration present on the September 2016 MRI and there was no indication that, before the injury, he was experiencing the type of pain caused by the injury. Thus, regardless of whether Case had a preexisting back condition, it was not until the September 2016 injury that he became disabled.

¶ 13    The Board's hearing on the application took place in August 2018 and March 2019. In addition to its other arguments, the Village argued that the Board should deny Case's application because in his preemployment physical examination he had failed to disclose his previous back pain.

¶ 14    The Board issued a detailed decision finding that Case was disabled as a result of the September 2016 injury and that he met the requirements for a duty disability pension. As to the Village's argument regarding Case's untruthfulness during the preemployment physical examination, the Board agreed that, "[a]lthough the Applicant denies suffering prior back injuries or experiencing prior back pain, the record is replete with evidence to the contrary." It noted that the physician's assistant who conducted the examination testified that, if Case had disclosed any history of back problems, more documentation from Case's treating physician would have been requested before Case could have been cleared for duty as a firefighter. Nevertheless, the Board held that Case's untruthfulness did not change the requirements for a duty disability pension and was "not an issue to be adjudicated by the Board." Case had clearly proved both that he was disabled and that the September 2016 injury led to his disability. The Board noted that the identified act need not be the sole cause of the disability and that it was sufficient that the act aggravated or exacerbated a previous, nondisabling condition.

¶ 15    As to whether Case's activity of loading water bottles into a cooler was an "act of duty" as that term is used in the Code, the Board stated that it was "a close call." The Board noted that the statutory definition for the term "act of duty" includes, among other things, any act imposed "by the rules or regulations of its fire department." *Id.* § 6-110. Case had argued that, because helping with the inspection and maintenance of the station house was one of his job duties, his commander had ordered him to load the water into the cooler, and he could have been disciplined if he did not

comply, he was performing an act imposed upon him by the rules and regulations of the fire department. The Board ultimately agreed and found that Case was entitled to a duty disability pension.

¶ 16 The Village sought administrative review in the circuit court. After reviewing the parties' written submissions and hearing oral argument, the circuit court reversed the Board's decision. It held that Case's injury was not caused by an "act of duty" because Case was not "saving the life or property of another" when the injury occurred. It also held that the Board erred in determining that it had no statutory authority to deny Case's application on the basis of his untruthfulness in his preemployment physical examination.

¶ 17 Case moved for reconsideration, which the circuit court denied. He also sought to stay the trial court's order permitting the Village to recoup the benefits he had received, pending the outcome of his appeal. The court stayed that portion of its order permitting recoupment but allowed the Village to discontinue further pension payments during the pendency of these appeals.

¶ 18                                     II. ANALYSIS

¶ 19 In an administrative review case, the appellate court reviews the decision of the agency, not that of the trial court. *Lindemulder v. Board of Trustees of the Naperville Firefighters' Pension Fund*, 408 Ill. App. 3d 494, 500 (2011). Case and the Board suggest that there are three issues: (1) whether the Board's determination that Case met the requirements for a duty disability pension was against the manifest weight of the evidence, (2) whether the Board erroneously declined to consider whether Case's application should be denied because of his misrepresentations in his preemployment physical examination, and (3) whether the disabling injury resulted from Case's performance of an "act of duty" as that term is defined under the Code. However, the Village disputes only the latter two issues and raises no other issues regarding the correctness of the

Board's decision. As the outcome of the first issue depends solely on the outcome of the second and third issues, we set the first issue aside and turn our attention to the second. We address the applicable standard of review in the context of each argument.

¶ 20          A. Whether the Board Could Deny a Duty Disability Pension Application

Based on Preemployment Misrepresentations by the Applicant

¶ 21    An administrative agency such as the Board "has no general or common law powers." *Gaffney v. Board of Trustees of the Orland Park Fire Protection District*, 2012 IL 110012, ¶ 38. "Rather, an agency's powers are limited to those granted by the legislature and any action must be specifically authorized by statute." *Id.* Here, the question is whether the Board was authorized by the Code to deny Case's application because of his misrepresentations during his preemployment physical examination. That question requires us to engage in statutory interpretation, the fundamental principles of which are familiar.

¶ 22    We must begin by examining the language of the statute, which is the most reliable indicator of the legislature's objectives in enacting a particular law. *Yang v. City of Chicago*, 195 Ill. 2d 96, 103 (2001). The statutory language must be afforded its plain and ordinary meaning, and where the language is clear and unambiguous we must apply the statute without resort to further aids of statutory construction. *In re Michael D.*, 2015 IL 119178, ¶ 9. We will not depart from the plain language of a statute by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent. *Id.* "One of the fundamental principles of statutory construction is to view all provisions of an enactment as a whole," and thus "words and phrases must be interpreted in light of other relevant provisions of the statute." *J.S.A. v. M.H.*, 224 Ill. 2d 182, 197 (2007). For an issue such as this that turns on questions of statutory interpretation, our review is *de novo*. *In re Appointment of Special Prosecutor*, 2019 IL 122949, ¶ 22.

¶ 23 Pursuant to section 4-110 of the Code, a firefighter "shall be entitled to a [duty] disability pension" if he or she, "as the result of sickness, accident or injury incurred in or resulting from the performance of an act of duty *** is found *** to be physically or mentally permanently disabled for service in the fire department." 40 ILCS 5/4-110 (West 2016). This provision sets the terms for the Board's consideration of an application for a duty disability pension: the Board must grant such a pension if it finds the existence of three elements—a permanently disabling injury, the performance of an act of duty, and a causal link between the two. The Board is not empowered to depart from these elements and impose its own test. As the plain language of section 4-110 makes clear, the question of whether a firefighter misrepresented his or her fitness for duty at the time of hire is not one of the items to be considered in determining whether a duty disability pension should be granted.

¶ 24 The Village argues that the Board is authorized to investigate fraud under a different part of the Code: section 1-135, which provides that anyone "who knowingly makes any false statement or falsifies *** any record of a retirement system or pension fund *** in an attempt to defraud [that system or fund] is guilty of a Class 3 felony." *Id.* § 1-135. The Village contends that, taken together with the fiduciary duty of the Board to administer the fund in a prudent manner (see *id.* § 1-109), this provision allows the Board to consider false statements in determining whether to grant a pension application.

¶ 25 At the outset, we note that there may be problems of proof with the Village's claim that Case's misrepresentations amounted to a crime under the Code. Section 1-135 criminalizes only false statements that were made in an attempt to defraud a pension fund. The evidence on Case's motivation for his statements is sparse—on the record that was before the Board, it is equally possible that Case misrepresented his medical history simply because he wanted to continue

working as a firefighter as it is that he did so because he planned to obtain a disability pension. We leave that issue aside, however, to focus on the legal question at hand: whether the Board had the authority to deny Case's pension application because he misrepresented his medical history when applying for employment.

¶ 26    Section 1-135 requires the Board to take action when confronted with what it reasonably suspects are false statements by applicants. But the action it is directed to take is not to become an investigative body, ferreting out untruths and using them to deny pension benefits. Rather, under section 1-135, a board that reasonably suspects that fraud has been committed must immediately notify the local state's attorney. *Id.* § 1-135 ("The board of trustees of a retirement system or pension fund *** shall immediately notify the State's Attorney of the jurisdiction where any alleged fraudulent activity occurred for investigation."); see also *id.* § 1-114 (the failure to notify the state's attorney of a reasonable suspicion of fraud is a breach of fiduciary duty). As the Code plainly sets out, it is the purview of the state's attorney, not the board to determine whether fraud was committed and, if so, to bring charges and pursue a conviction. The board's general fiduciary obligation to pay disability benefits only to "those who qualify for such payments" (see *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 544 (2006)) cannot change this statutory scheme. None of the statutory provisions cited by the Village support its contention that the Board was authorized to determine whether Case committed fraud, and we cannot read such authorization into the Code. See *Michael D.*, 2015 IL 119178, ¶ 9.

¶ 27    We note that there is almost no case law on the relevancy of preemployment false statements in a pension determination (the Village cited none). Further, the case law that does exist supports the conclusion that the Board was correct to focus on whether Case met the requirements for a duty disability pension under section 4-110, not on his misrepresentations during the

employment application process. In *Siwinski v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 2019 IL App (1st) 180388, a paramedic developed post-traumatic stress disorder (PTSD) that prevented her from working. When she applied for a duty disability pension, the board of the pension fund denied her application, based in part on her failure to list all of her prior mental health treatment when applying to work for the Chicago Fire Department, finding that her earlier omissions undermined her credibility with respect to her reports and descriptions of her symptoms. *Id.* ¶ 32. However, both of the IMEs, who were qualified to express opinions regarding mental health issues, found that Siwinski suffered from disabling PTSD stemming from her work and that her prior mental health issues were not the source of her disability. *Id.*

¶ 28     Noting that " 'tangential issues' that do not 'impact the plaintiff's veracity concerning [her] injury' do not, of themselves, destroy the plaintiff's credibility regarding her injury," the appellate court found that Siwinski's omissions in her job application were unconnected to the issue of whether her PTSD was caused by events that occurred years later. *Id.* (quoting *Lambert v. Downers Grove Fire Department Pension Board*, 2013 IL App (2d) 110824, ¶ 25. The court held that the board was incorrect to dismiss Siwinski's reports of her symptoms, which were consistent over time and which the IMEs accepted, and that the board's decision was against the manifest weight of the evidence. *Id. Siwinski* thus suggests that preemployment misstatements should play only a limited role in pension determinations: although they may have some relevance to credibility determinations, where the clear weight of the medical evidence supports the conclusion that the applicant has a disabling injury or condition that was caused by an act of duty, a pension board may not use such misstatements to justify denying a duty disability pension.

¶ 29     The facts of this case are very similar to those in *Siwinski*. Both in that case and here, the applicants for duty disability pensions had documented preexisting health conditions and failed to

disclose them fully on their job applications, but the medical evidence demonstrated that later work-related events were the cause of the applicants' disabilities. Indeed, the relevance of Case's misstatements to the pension determination was even less than in *Siwinski*, because the Board was not required to rely on his self-reports or weigh his credibility in deciding whether he was disabled or the cause of that disability. His pre- and post-injury MRIs objectively established a disabling condition that did not exist before he was hired, and there was no real dispute as to the event that caused that disability. In the face of clear objective evidence of a disabling injury and its cause, and unanimous opinions by the IMEs, the Board did not err in declining to consider Case's preemployment misstatements.

¶ 30 The Village cites *Marconi*, 225 Ill. 2d at 544, for the proposition that a pension board owes a fiduciary duty to screen out "unqualified or fraudulent disability claims, so that funds are not unfairly diverted to undeserving applicants." The Village argues that Case's misrepresentations show that he was undeserving of a pension and that *Marconi* requires the Board to take such unworthiness into account when determining whether an applicant may receive pension benefits. *Marconi* involved different facts, however. There, the applicant misrepresented the nature and cause of his injury, and the pension board found that the evidence did not support his claims of disability or line-of-duty causation. *Id.* at 541. Such misrepresentations are clearly germane to a pension board's statutory duty to determine the extent and cause of an applicant's disability. Here and in *Siwinski*, by contrast, the applicants' preemployment omissions or misrepresentations did not affect their ultimate disabling injuries, which the evidence showed were independent of their medical histories. The supreme court's comments in *Marconi* about "undeserving" applicants were intended not to place pension boards in the position of policing applicants' general morality, but

to preserve pension boards' ability to make the determinations they are statutorily charged with making.

¶ 31    A pension board's determination on an application for a duty disability pension must be rooted in section 4-110, which sets out the requirements for such a pension, and the board's fiduciary duties do not give it license to act as an investigative or prosecutorial body with respect to preemployment misstatements. Our conclusion does not leave pensions boards without recourse, however. If Case had been convicted of fraud in connection with his employment application, the Code ensures that he would not be eligible for pension benefits of any kind. See 40 ILCS 5/4-138 (West 2016) (no pension fund benefits can be paid to anyone convicted of "any felony relating to or arising out of or in connection with service as a firefighter"). But Case has not been convicted of such a felony; he has not even been charged with one. Thus, section 4-138 does not apply here. Under the circumstances of this case, the Board acted properly in declining to consider Case's false statements, which the IMEs unanimously found to be irrelevant to his current disability, and instead hewing to the test set out in section 4-110.

¶ 32        B. Whether Case's Injury Occurred While Performing an "Act of Duty"

¶ 33    We turn to the central issue in this case: whether Case was performing an act of duty, as that term is defined by the statute, when his disabling injury occurred. The parties dispute the standard of review to be applied. The Village argues that, as we are determining the meaning of a statutory term, we should review the Board's determination *de novo*. See *Gaffney*, 2012 IL 110012, ¶¶ 50-51 (the issue of whether a situation perceived by a firefighter to be an emergency was within the statutory definition of "emergency" was one of statutory construction). The Village argues that *de novo* review is appropriate here, as questions of statutory interpretation predominate and the Board's factual determinations about the disabling nature of Case's injury and its causation are not

disputed. The Board and Case argue that, in *Frisby v. Village of Bolingbrook Firefighters' Pension Fund*, 2018 IL App (2d) 180218, ¶ 15, we held that the "clearly erroneous" standard applied to this type of issue. See *id.* (the question of whether the circumstances surrounding the plaintiff's injury satisfy the statutory standard "is a 'textbook' example of an issue warranting" clear-error review); see also *Howe v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 2015 IL App (1st) 141350, ¶ 47 (applying "clearly erroneous" standard where the issue was whether undisputed facts met the statutory standard). Under that standard, we will reverse an agency decision "only where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 395 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). We need not resolve which standard applies here, however, as our conclusion would be the same under either standard.

¶ 34    Although section 4-110 (which governs duty disability pensions for firefighters in smaller municipalities like the Village) does not define the term "act of duty," courts have held that it means the same thing as the definition of "act of duty" found in section 6-110 (40 ILCS 5/6-110 (West 2016)), a companion statute governing duty disability pensions for firefighters in large cities. See *Jensen v. East Dundee Fire Protection District Firefighters' Pension Fund Board of Trustees*, 362 Ill. App. 3d 197, 203-04 (2005). Under that definition, an "act of duty" includes any act that is (1) "imposed on an active fireman by the ordinances of a city, or [(2)] by the rules or regulations of its fire department, or [(3)] any act performed by an active fireman while on duty, having for its direct purpose the saving of the life or property of another person." 40 ILCS 5/6-110 (West 2016).

¶ 35    To qualify for a duty disability pension, firefighters need only show that one of these definitions is met. See *O'Callaghan v. Retirement Board of Firemen's Annuity & Benefit Fund of Chicago*, 302 Ill. App. 3d 579, 583 (1998) (noting disjunctive "or" between each clause of the definition). Case contends that, when he was injured, he was engaged in the second of these: performing an act required by the rules and regulations of the Village's fire department.[2] He argues that the rules of the fire department required him to follow the chain of command, and it is undisputed that he was on duty and was carrying out the orders of his shift commander when he was injured. The Board's determination that Case was performing an act of duty relied on this rationale, commenting that "[f]ailure to carry out these orders could no doubt result in discipline." Similarly, in *O'Callaghan*, the reviewing court found that the applicant was performing an act required by fire department rules and regulations when he was injured during a training exercise. *Id.*

¶ 36    The Village argues that this definition of "act of duty" is too broad, as it would mean that any act done at the behest of a superior officer while on duty is an act of duty. The Village contends

---

[2] Case did not contend that his act of loading water bottles into the cooler was undertaken for the "direct purpose" of saving life or property (40 ILCS 5/4-110, 6-110 (West 2016)) and that thus the trial court erred in reversing the Board's award of a duty disability pension on the basis that Case did not meet this standard. See *O'Callaghan*, 302 Ill. App. 3d at 583 (the phrase "having for its direct purpose the saving of the life or property of another person" modifies only the third definition of "act of duty," not the first two (internal quotation marks omitted)). This error does not matter here, however, as we review the decision of the Board, not the trial court. *Lindemulder*, 408 Ill. App. 3d at 500.

that this approach is contrary to the third definition of "act of duty," which covers on-duty acts but only if they were undertaken for the purpose of saving life or property. See 40 ILCS 5/6-110 (West 2016).

¶ 37    In support of its argument, the Village cites a recent case of ours, *Frisby*, 2018 IL App (2d) 180218. In *Frisby*, a firefighter sought a duty disability pension for injuries sustained when she slipped on black ice getting out of her car at the fire station on her way to work, 20 minutes before her shift started. *Id.* ¶ 4. The pension board denied her application, and we affirmed, finding that she was not performing an act of duty when she was injured. *Id.* ¶ 24. Specifically, she was not yet on duty when the accident occurred, and "no Village ordinance or fire-department rule or regulation imposed [on her] the act of exiting her vehicle in the parking lot." *Id.* ¶ 23. In reaching this conclusion, we rejected her argument that, because fire department regulations required her to be at work and prepared to start her shift (including being in uniform) at 7 a.m., her early arrival and traversal of the parking lot was similarly required by the regulations. We found that this argument—that any act undertaken as part of a process of complying with a fire department regulation should be considered as if it were directly required by such a regulation—would extend the definition of "act of duty" too far. *Id.* We noted that "not every act that happens even *at work, while on duty*, constitutes an 'act of duty,' " because, under the third definition of that term, such acts would qualify as acts of duty only if undertaken for the purpose of saving life or property. (Emphasis in original.) *Id.*

¶ 38    The Village seizes on this last statement, arguing that *Frisby* thus holds that, if a firefighter is on duty when the injury occurs, he or she can can *only* qualify for a duty disability pension if the action was undertaken for the purpose of saving life or property—even if a separate definition of "act of duty," such as the action being required by law or regulation, would apply. This is a

misreading of *Frisby*. Indeed, we implicitly rejected that very argument in *Frisby*, distinguishing the applicant's examples of actions that qualified as "acts of duty" on the basis that each of them "would occur while the firefighter was performing a required task while on duty." *Id.* ¶ 24. The clear implication of this distinction is that, if a firefighter's on-duty action was required by law or fire department regulations, it would qualify as an act of duty regardless of whether it was undertaken for the purpose of saving life or property. *Id.*

¶ 39   The Village's argument was rejected not only in *Frisby*, but also in *O'Callaghan*. See *O'Callaghan*, 302 Ill. App. 3d at 583 ("Since the plaintiff here was injured while performing an act imposed on him by the rules and regulations of the Department, he is not required to prove that the act also had for its direct purpose the saving of the life or property of another person."). Further, it is contrary to the ordinary rules of statutory construction, which command that we read the words of a statute using their ordinary and popularly understood meanings. *People v. Beachem*, 229 Ill. 2d 237, 244 (2008). As noted above and in *O'Callaghan*, section 6-110 of the Code defines "act of duty" to include (1) "[a]ny act imposed on an active fireman by the ordinances of a city," *or* (2) any act imposed "by the rules or regulations of its fire department," *or* (3) "any act performed by an active fireman while on duty, having for its direct purpose the saving of the life or property of another person." 40 ILCS 5/6-110 (West 2016); see *O'Callaghan*, 302 Ill. App. 3d at 583. "The word 'or' ordinarily is used in the disjunctive sense ***." *People v. Howard*, 2017 IL 120443, ¶ 21. Thus, if Case was performing an action required by the rules or regulations of the Village's fire department, he did not need to prove that his action was also undertaken to protect life or property. *O'Callaghan*, 302 Ill. App. 3d at 583.

¶ 40   As for the Village's assertion that the Board applied too broad a definition of "act of duty," that complaint is more properly directed at the General Assembly, which chose to define the term

broadly. The Board's duty was not to craft its own, narrower definition but to apply the definition provided in the Code. The Board did just that, and we find no error in its decision.

¶ 41                                    III. CONCLUSION

¶ 42     The judgment of the circuit court of Du Page County is reversed and the decision of the Board is affirmed.

¶ 43     Circuit court judgment reversed; Board decision affirmed.

---

**No. 2-20-0360**

---

| | |
|---|---|
| **Cite as:** | *Village of Roselle v. Board of Trustees of the Roselle Firefighters' Pension Fund*, 2021 IL App (2d) 200360 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Du Page County, No. 19-MR-1032; the Hon. Bonnie M. Wheaton, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Richard J. Reimer and Bryan L. Strand, of Reimer Dobrovolny & Labardi PC, of Hinsdale, for appellant Board of Trustees of the Roselle Firefighters' Pension Fund. |
| | Thomas W. Duda and Thomas E. Mazur, of Law Offices of Thomas W. Duda, of Palatine, for other appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Karl R. Ottosen and Meganne Trela, of Ottosen DiNolfo Hasenbalg & Castaldo, Ltd., of Naperville, for appellee. |

---